IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| JARED ROSLING,<br><br>      Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD; ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>      Respondents. | Cause No. CV 12-161-M-DLC-JCL<br><br><br>FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |

On September 15, 2012, Jared Rosling, a state prisoner proceeding pro se, filed a motion seeking the appointment of counsel to prepare a petition under 28 U.S.C. § 2254. On July 3, 2013, still proceeding pro se, he filed a proper petition under § 2254.

## I. Factual and Procedural Background

This case involved the extraordinarily vicious murder of a 21-year-old woman. Rosling was charged with deliberate homicide, a violation of Mont. Code Ann. § 45-5-102(1)(a) (Count 1); felony murder, in violation of Mont. Code Ann. § 45-5-102(1)(b) (Count 2);[1] aggravated kidnapping, a violation of Mont. Code Ann.

---

[1] Counts 1 and 2 were pled in the alternative.

§ 45-5-303(1)(c) (Count 3); aggravated burglary, a violation of Mont. Code Ann. § 45-6-204(2)(b) (Count 4); tampering with evidence, a violation of Mont. Code Ann. § 45-7-207(1)(a) (Count 5); and criminal possession of methamphetamine, a violation of Mont. Code Ann. § 45-9-102 (Count 6).

On Sunday, February 1, 2004, Rosaline Diehl, who was about 70 years old, awakened at her usual time, around 6:00 a.m. When she came into her living room, she saw a white car pull up and park in front of her house on the opposite side of the street. Because she lived on a dead end, she wondered who would be pulling up and parking there at 6:00 on a Sunday morning. She saw someone get out of the driver's side of the vehicle, but it was still too dark to see what the person looked like or where the person went. 2 Trial Tr. at 259:9-260:23. Diehl told the first officer she talked to that she went back to bed, but a day or two later, *id.* at 285:7-17, she corrected that portion of her statement and said she stayed awake and kept an eye on the car because she thought its presence was suspicious. Over the next two hours or so, she noted every detail of the car's appearance. At around 8:00 a.m., she saw a tall, thin, well-built man with darkish hair, carrying a paper bag and wearing a waist-length jacket, move quickly up to the driver's side of the vehicle. He got in, turned the vehicle around, and drove away. *Id.* at 262:15-266:15, 267:20-271:10.

Just around the corner, at about 8:00 a.m., Richard Dooley arrived at his daughter Jessica's residence to pick up some snowmobiles. After Dooley hitched the snowmobiles to his trailer, he went into the house to check on his daughter. He immediately smelled smoke and noted it was not coming from the wood stove, which was cold. He began looking through the house for the source. In a bathroom, he found his daughter's naked body, stabbed repeatedly, with a plastic bag tied over her head by a cord around her neck. Magazines piled around her had been set alight. Dooley tried to douse the flames with water, then retrieved a fire extinguisher. When the fire was out, he called 911. 2 Trial Tr. at 223:13-226:24. Police and fire fighters were dispatched at 8:23 a.m. *Id.* at 237:6-7.

An autopsy indicated that Jessica had been stabbed at least 67 times, principally in the torso, and cut at least 28 times, principally on the right side of her neck.[2] The stab wounds were the cause of death. Jessica died before the bag was placed over her head and before the fire started, but she had been manually strangled before she was stabbed, and she had blunt-force wounds on her face and head consistent with being punched or shoved into something solid. There was no evidence of traumatic sexual assault. 4 Trial Tr. at 702:3-4, 702:20-703:7, 704:5-19, 706:15-708:19, 710:16-713:19, 714:20-721:25.

---

[2]   The forensic pathologist testified that a stab wound is deeper than it is long and a cut is longer than it is deep.

Clothes that appeared to have been used to wipe up feces were found in the bathroom and in a nearby bedroom. Jessica's cell phone was found on a chair in the bedroom. 3 Trial Tr. at 432:20-22. Blood was also found in the bedroom. *Id.* at 395:1-8, 407:20-410:23. There was a trail of fecal material on the bedroom floor. *Id.* at 414:6-416:25. Investigators inferred that Jessica had been strangled in the bedroom, causing her to defecate and urinate into her shorts, 4 Trial Tr. at 709:5-710:14, then was dragged into the bathroom, where her clothes were removed and she was stabbed and cut. The state of the bathroom indicated that water had been used to clean up much of the blood. *E.g.*, 3 Trial Tr. at 391:21-401:6. A knife consistent with the wounds on Jessica's body and showing traces of her blood was found in a kitchen cupboard. 2 Trial Tr. at 374:5-375:9; 4 Trial Tr. at 719:21-720:6; 7 Trial Tr. at 1234:10-19. Blood spots and smears, some diluted, were found in the kitchen. 2 Trial Tr. at 365:9-16, 369:5-375:9. The magazines that were set alight in the bathroom appeared to have come from another bedroom at the south end of the house that was being used for storage. 3 Trial Tr. at 382:19-383:7, 388:13-25. In the basement, blood spots were found in another bathroom. The sink and tub were dry, the toilet had not been flushed recently, and the basement area generally appeared not to have been occupied for a while, *id.* at 429:19-432:15, but a towel, "heavy and soaking wet," was found in the tub, *id.* at 421:6-426:9.

Shortly after the murder, detectives took Rosaline Diehl to a local car dealer. She walked through the lot to attempt to find a car like the one she had seen. She said the last car on the lot, a 1999 Pontiac Grand Am, was identical in make, features, and detailing to the one she saw parked outside her house, except the car on the lot was silver or grey, and the one that parked in front of her house on the morning of the murder was white. Rosling's car was a white 1999 Pontiac Grand Am with features and detailing identical to the car Diehl identified. 2 Trial Tr. at 274:9-278:15; 3 Trial Tr. at 513:11-523:1; 5 Trial Tr. at 836:12-14. Diehl testified that the pictures and video she saw of Rosling in the press were similar to the figure she saw approaching the car. 2 Trial Tr. at 279:10-281:2.

Rosling met Jessica a little over a week before her murder, when he accompanied friends to a party at her house. 7 Trial Tr. at 1315:19-1316:7. From Saturday evening through the early morning hours of Sunday, February 1, Rosling was with some of the same group of friends, including Ryan Hill, Newly Potter, Beau Brenneman, Josh Wood, Mike Taylor, and Jessica. *E.g.*, *id.* at 1319:13-1321:7. When the bars closed, the group went to Wood's house and played "quarters," a drinking game, inflicting small wounds on several people's knuckles, including Jessica's. 4 Trial Tr. at 712:18-713:4; 7 Trial Tr. at 1324:7-1326:19. At about 4:30 or 5:00 a.m., Rosling, Jessica, and Taylor left Wood's house. Rosling

drove Taylor and Jessica back to the Valley Hub, a bar where they had each left their vehicles earlier.[3] 5 Trial Tr. at 746:14-748:8; 7 Trial Tr. at 1326:20-1327:10.

Rosling was interviewed twice by Detective Fischer: shortly before 9:00 p.m. on Sunday night, February 1, and again the next morning, February 2. Fischer noticed a bruised area on one of Rosling's hands, but Rosling said he had just been leaning on it. A photograph of Rosling's hands and upper body was shown to the jury at trial. The photograph revealed no injuries or marks other than the mark on Rosling's hand. 4 Trial Tr. at 577:11-579:8, 607:18-608:19. Analysis of Rosling's urine showed he had ingested methamphetamine and caffeine but not marijuana. *Id.* at 598:3-6.

In his first interview, Rosling made the following statements.[4] He used methamphetamine three times in his car at the Valley Hub and once at another establishment, Lucky Lil's. 9 Trial Tr. at 1573:1-6 (asserted in State's closing argument without objection). After dropping Jessica and Taylor off at the Valley Hub, he went back to Wood's house, parked outside, and slept in his car for 3-3½ hours. 4 Trial Tr. at 585:11-16. Because the group had talked about going skiing and he needed ski clothes, he went to Walmart between 7:00 and 7:30 a.m.; he

---

[3] Taylor arrived at his home between 5:00 and 6:00 a.m., highly intoxicated, and played cribbage with his early-riser landlord, Randy Pickett. Jessica's boyfriend, John Fleming, did not go out with the group on Saturday night. He spent the night at his grandparents' house and clocked in to work at a local restaurant at 7:09 on Sunday morning.

[4] Rosling's interviews were recorded and played for the jury at trial. 3 Trial Tr. at 572:3; 4 Trial Tr. at 602:5. Because the recordings are not in the record of the case in this Court, their contents are indirectly evidenced by other questions and answers in the trial transcript.

also said he was at Walmart at 9:00 a.m. He told Fischer he was sure he was at

Shopko at about 9:45 a.m., because he talked to Pat Casey on the phone at 10:00

a.m. while he was at Shopko and bought new ski gloves.

In the second interview, Rosling said he remembered arriving at the Great

Divide ski area between 10:30 and 11:00. *Id.* at 585:9-16, 622:3-624:10.

Evidence obtained from surveillance cameras contradicted Rosling's

statements. Surveillance cameras at Walmart recorded Rosling walking into the

store at about 8:20 on Sunday morning. Unlike surveillance footage from Lucky

Lil's the previous night, which showed Rosling wearing jeans, 5 Trial Tr. at

948:14-950:5; 7 Trial Tr. at 1387:25-1388:5, the Walmart tape showed Rosling

wearing light-colored long johns. He kept his gloves on while paying cash for

Starter brand cotton sweat pants, two pairs of boxers, and thermal socks. He left

Walmart at 8:35 a.m. Other than Rosling's testimony that he was shopping for ski

clothes throughout the morning hours, there was no further evidence to show his

whereabouts until 10:27 a.m., when he returned to Walmart. He bought a birthday

card, walked out wearing ski pants he did not pay for, then went to other stores as

well. At Shopko, he bought new Dri-Max gloves at 11:14 a.m. Sometime after

12:00 noon, he rented skis near the entrance to Great Divide. 4 Trial Tr. at 581:18-

587:23, 632:12-635:25; 7 Trial Tr. at 1382:23-1383:6; 8 Trial Tr. at 1433:19-

1434:5, 1437:4-1438:14, 1440:25- 1441:14.

In at least one interview, possibly both, Detective Fischer accused Rosling of killing Jessica and stated that forensic analysis would show the sources of the blood at the scene and on Rosling's clothing. 4 Trial Tr. at 616:8-620:8. Rosling denied killing Jessica. 9 Trial Tr. at 1612:14-17 (asserted in defense closing argument without objection).

Although a large number of forensic samples were collected and tested, little conclusive evidence emerged. Rosling's jacket was found hanging in a closet at his girlfriend's house, and other clothes were found by investigating officers in the dryer. These included the various clothing items Rosling purchased on Sunday morning and the jeans Rosling said he was wearing on the night of Jessica's murder. 3 Trial Tr. at 507:9-513:2. None of the clothes in the dryer revealed anything worth mention. At the scene, there were numerous fingerprints, but few were suitable for comparison with known prints, and all that were identified came from either Jessica or her recent roommate, Jenny Masson. 6 Trial Tr. at 1117:19-24. A palm print found in the bathroom was not Jessica's but was not compared to anyone else's print. Tire tracks found at the scene did not match Rosling's car. *Id.* at 1120:15-17. Footprints found at the scene were consistent with Rosling's size 12 Nikes but had no distinguishing characteristics other than size and tread. *Id.* at

1125:10-1127:2.[5] A single facial hair, red or brown in color, was found on (not inside) the plastic bag that covered Jessica's head. Under a microscope, it resembled a hair from Rosling's goatee. The two hairs had the same mitochondrial DNA sequence except at one genetic location. *Id.* at 1146:19-1149:23, 1152:14-1154:12, 1194:13-1195:12.

Weak indications of blood were found in Rosling's car on the steering wheel, driver's seat, gear shift, and a cup holder in the rear passenger compartment, but none of it could be connected to Jessica. 7 Trial Tr. at 1219:18-1227:12.[6] The Dri-Max gloves Rosling bought at Shopko were found in the trunk of his car. Inside the right-hand glove, in the palm area, was a trace of blood, but no DNA could be extracted and there was not enough to determine whether the blood was human. *Id.* at 1254:23-1256:16. Rosling's shoes were suffused with blood, at least in certain places, but the traces were, again, too diffuse to support DNA or species testing. From one location on one of the shoes, a partial DNA profile was extracted, but both Rosling and Jessica were excluded as its sources. *Id.* at 1268:6-1270:7, 1280:1-12.

---

[5]  Ryan Hill, another of Jessica's friends, did not wear size 12. Some blood and saliva found on a wall near the bathroom was Hill's, but he and other witnesses remembered how and when it got there at Jessica's party several days before. There were no indications that Hill was present at the time in question. Hill's girlfriend, Dawnell Shimkevich, testified he was with her.

[6]  As to some traces, neither Rosling nor Jenny Masson could be excluded as contributors.

Rosling's ski jacket had traces of blood spatter and of a white particulate matter of a basic pH level consistent with soap. 6 Trial Tr. at 1159:21-1167:8. With one exception, among the DNA that could be isolated from the blood found on the jacket, neither Jessica nor Rosling could be excluded as the source. The exception was a sample taken from a spot located on the left shoulder of the coat. The blood there was concentrated and clinging to the top of the fabric, not smeared, diluted, or soaked in to the fabric. It had distinct edges and a crusty texture to it. The expected frequency of that blood's DNA sequence occurring was 1 in 179,200,000. The sequence was the same as Jessica's. 7 Trial Tr. at 1272:19-1278:21.

In his interviews with Detective Fischer, Rosling said he had smoked marijuana with Jessica at the party at her house the week before the murder. In his trial testimony, he said he was not truthful with Fischer, as he had smoked marijuana in his car on the night of the murder, and Jessica may have had some too. But there was no THC in Jessica's system and, in Rosling's, only methamphetamine and caffeine. 4 Trial Tr. at 598:3-6; 7 Trial Tr. at 1360:6-1361:20. Rosling told both Fischer and his friends that he returned to Wood's house to sleep in his car after leaving Taylor and Jessica at the Valley Hub. Beau Brenneman testified that Rosling asked, on Sunday morning, whether Brenneman remembered seeing Rosling come into Wood's house to use the bathroom in the early morning hours; Brenneman did not see Rosling. 6 Trial Tr. at 1030:9-

1031:18. Rosling admitted he lied to Brenneman and to Fischer when he said he slept in his car outside Wood's house. 7 Trial Tr. at 1391:21-1393:6. To both his friend Ryan Hill and Detective Fischer, Rosling said his girlfriend, Janis Hazlitt, "would not let me in the house" so he "had to go buy all this new stuff" to go skiing on Sunday morning. 8 Trial Tr. at 1430:12-18. At trial, Rosling admitted Hazlitt did not refuse to let him in the house. He did not even talk to her until he got to Great Divide. 5 Trial Tr. at 825:8-827:7; 7 Trial Tr. at 1349:4-9. Rosling did not explain why he told these lies.

At trial, Rosling testified that he used methamphetamine only once, in the parking lot before he left Bullwhacker's, the first bar he went to that night. 7 Trial Tr. at 1366:1-12.[7] He claimed that Jessica invited him over to her house to "go hot-tubbing." *Id.* at 1324:14-24.[8] After the party at Wood's house, and after he dropped off Taylor and Jessica at the Valley Hub – where, Rosling said, Jessica renewed her invitation, *id.* at 1328:3-19 – Rosling said he went back to Hazlitt's house. He intended to go in, but when he arrived he changed his mind; he knew Hazlitt would

---

[7]    Surveillance footage from a bar on Saturday night showed hand-to-hand transactions in which Rosling gave cash to one Travis Ryan; Rosling said he was buying drinks, but the prosecutor suggested he was buying methamphetamine. 7 Trial Tr. at 1367:7-1372:5.

[8]    Rosling said he and Jessica were alone in his car for a moment when he pulled up at Wood's house. He testified:

> She asked me if I wanted to go hot tubbing at her house. We drove half a block, and I don't know exactly why we turned around, but I knew that it was because I didn't have any drugs. I was going to try and get some, and then we were going to go to her house and hot tub.

7 Trial Tr. at 1324:19-24.

not allow him to leave the house again, and he wanted to go skiing with his friends. Instead of pulling into the driveway, therefore, he parked where Hazlitt could not see his car if she happened to look out. He went into the garage to get some warm clothes. He found a pair of long johns but nothing else he could wear. He took them, returned to his car, and drove back to Wood's house. But, once he arrived there, he changed his mind again, decided to accept the hot-tub invitation, and went to Jessica's house. *Id.* at 1330:6-1334:24.

Rather than parking behind Jessica's car in the driveway, or in front of her house, or alongside it, Rosling said he parked across the street and halfway down the dead-end block of Peosta Street, across from Rosaline Diehl's house. Asked at trial whether he parked that far away and "walked down the icy street to surprise [Jessica]," Rosling answered, "No." 7 Trial Tr. at 1399:22-1402:25. He said, "My intentions were to go over there like she had asked me. I don't think it would have been that big of a surprise," *id.* at 1403:2-4, because Jessica invited him over. The prosecutor then showed him a letter he had written to his family sometime before trial, in which he said he went to Jessica's house to "surprise" her. *Id.* at 1405:6-23.[9] Rosling also testified that, when he arrived at her house, he knocked at both doors at the front of the house. *Id.* at 1336:7-17. But there was only one set of footprints in the snow in that area, and they came out of the house. Rosling said

---

[9] Rosling's letters were admitted into evidence at trial by stipulation. They are not in the record before this Court.

those prints showed the path he took out of the house. 7 Trial Tr. at 1406:3-18, 1409:19-1411:18; 8 Trial Tr. at 1416:25-1419:15.

Rosling said that when Jessica did not respond to his knocks at the front doors, he went around the back of the house, jumped over the back yard fence, and approached a sliding glass door. 7 Trial Tr. at 1336:7-1337:18. Because it was slightly open, Rosling "figured that she was already getting prepared for the hot tub, she was expecting me." *Id.* at 1337:6-16. No footprints were found on the route Rosling said he took from the front door to the back yard fence. But there were prints showing that someone came instead from the street to the back fence, then jumped over it and approached the sliding glass door. Rosling agreed those prints were in the same place where he jumped the fence and approached the door. 8 Trial Tr. at 1416:25-1419:15.

Rosling testified that he entered the house and went in to the kitchen, calling Jessica's name. Although he claimed he saw Jessica's feet in the bathroom from where he was standing in the kitchen, 7 Trial Tr. at 1338:4-9, on cross-examination, he admitted he could not have seen her from where he said he was, 8 Trial Tr. at 1420:25-1423:5. He said he walked toward the bathroom and saw Jessica, dead, but he did not recall whether he saw any magazines, flames, or the plastic bag on Jessica's head or whether he smelled gasoline or blood. He only recalled seeing "the blood and the body and the breast area." He "did not try and

see if she was alive," *id.* at 1425:19-1427:10, because "that was not a scene that looked like someone needed help," 7 Trial Tr. at 1340:20-21. He did not call 911 because he had been drinking and doing drugs, and that would get him into trouble. *Id.* at 1340:14-17.

Because he was so shocked, Rosling said, he wanted to "leave, get out of there," "wanted to get up to that ski hill fast," "get out, go to the mountains." *Id.* at 1340:25-1341:14. To go skiing, he needed ski pants, socks, and other ski clothing. Referring to the long johns he picked up at Hazlitt's house, Rosling testified that he removed his jeans and changed into the long johns in the driver's seat of his car. He admitted "it's not easy," 8 Trial Tr. at 1434:15-20, as he is over six feet tall, and he admitted he knew Walmart had a bathroom and changing rooms he could have used, 7 Trial Tr. at 1388:24-1389:17. On the surveillance tape, a dark spot on the long johns was visible. Asked whether it was a stain, Rosling said it was a hole he tore in the long johns so he could use the bathroom more easily when he was out hunting. 8 Trial Tr. at 1436:9-17. In sum, Rosling testified that he removed his jeans in his car, put on a pair of long johns with a hole in front, then walked into Walmart to shop for a third pair of pants. He bought socks, Starter pants, and boxers – all new lower-body clothing – and a soda. 4 Trial Tr. at 584:11-14. He used Walmart's changing room to take off the long johns and put on the new Starter pants before he left the store. Then he threw the long johns away because

they "were ruined." 7 Trial Tr. at 1386:5-9. (He also said, twice, that he never threw any clothing away. 8 Trial Tr. at 1435:19, 1440:9-10.) Rosling did not explain why he took off his jeans in the first place.

The jury convicted Rosling of deliberate homicide, aggravated kidnapping, aggravated burglary, tampering with evidence, and criminal possession of methamphetamine. A verdict on Count 2, felony murder, was precluded by the guilty verdict on Count 1.

On January 14, 2005, Rosling was sentenced to serve prison terms of life without parole for deliberate homicide; life for aggravated kidnapping; 40 years for aggravated burglary; 10 years for tampering with evidence; and 5 years for criminal possession of methamphetamine, all sentences to run concurrently. Sentencing Tr. (Doc. 11-12) at 85:22-86:4; Judgment (Doc. 11-13) at 3-4.

Rosling appealed. He challenged the sufficiency of the evidence to support each conviction and various aspects of the sentence. The Montana Supreme Court affirmed in all respects. *State v. Rosling*, 180 P.3d 1102, 1119 ¶ 80 (Mont. 2008). Rosling timely petitioned for rehearing, but the petition was denied on April 2, 2008. Order at 1, *Rosling*, No. DA 05-222 (Mont. Apr. 2, 2008). Rosling's conviction became final 90 days later, on July 1, 2008. 28 U.S.C. § 2244(d)(1)(A); U.S. S. Ct. R. 13(1), (3); *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

On May 21, 2009, Rosling filed a petition for postconviction relief in the trial court. Case Register (Doc. 11-14) at 1 Entry 1. He was represented by counsel. After an evidentiary hearing, the trial court denied relief. Rosling again appealed, raising the same issues he now raises in his federal petition. On August 21, 2012, the Montana Supreme Court affirmed the trial court's denial of postconviction relief. *Rosling v. State*, 285 P.3d 486, 491 ¶ 38 (Mont. 2012).

On September 15, 2012, Rosling filed a motion in this Court seeking the appointment of counsel to assist him in preparing a petition. On September 26, 2012, he was advised that he is not entitled to counsel to help him prepare a petition. He was ordered either to withdraw the motion, if he chose not to proceed in federal court at the time, or file an Amended Petition. He responded by renewing his request for counsel. On October 4, 2012, he was again ordered to file an Amended Petition. He responded by moving for reconsideration on October 24, 2012, but his motion stated two potential claims for relief. *See* Mot. for Reconsideration (Doc. 6) at 2-3.

Based on those claims, the Court ordered the State to file the trial, sentencing, and postconviction transcripts and the judgment. The State responded on December 5, 2012. On May 8, 2013, Rosling was again ordered to decide whether he wished to withdraw his petition or to proceed, in which case he was required to file an Amended Petition.

On July 3, 2013, Rosling filed an Amended Petition.

## II. Rosling's Claims

Rosling asserts that trial counsel was ineffective. He avers that counsel should have obtained testing of a latent palm print found at the scene of the crime and should have objected to portions of the prosecutor's closing argument that mischaracterized Rosling's testimony, commented on Diehl's credibility, and mischaracterized the mitochondrial DNA evidence. Am. Pet. (Doc. 15) at 3-4 ¶¶ 15A-B; Verified Pet. (Doc. 15-1) at 3, 5; Br. (Doc. 15-3) at 2-13.

Rosling also alleges that appellate counsel was ineffective for failing to raise two claims on appeal. First, counsel did not contest the trial court's denial of his motion for mistrial based on a Power Point blunder that briefly displayed inadmissible photographs of Rosling's Nazi tattoos to the jury; and second, counsel did not challenge Rosling's absence from an in-chambers conference on the issue of Officer Davis's proposed testimony. Am. Pet. at 5-6 ¶¶ 15C-D; Verified Pet. at 4, 6-7; Br. at 13-24.

Previously, in his motion for reconsideration, Rosling alleged that the evidence was not sufficient to support his convictions. Mot. for Reconsideration (Doc. 6) at 2-3.

### III. Procedural Posture of the Case

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading. The district court's task is to determine whether further proceedings are warranted, such as the ordering of a responsive pleading, appointment of counsel, or an evidentiary hearing.

Counsel must be appointed "when the case is so complex that due process violations will occur absent the presence of counsel," *Bonin v. Vasquez*, 999 F.2d 425, 428-29 (9th Cir. 1993) (discussing *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986) (per curiam)), or when an evidentiary hearing is required, Rule 8(c), Rules Governing § 2254 Cases. Counsel may be appointed at any stage of the proceedings if "the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(B). Under § 3006A, the court must consider the likelihood of success on the merits, the complexity of the legal issues involved, and the petitioner's ability to articulate his claims pro se. *Weygand v. Look*, 718 F.2d 952, 954 (9th Cir. 1983) (per curiam). "These considerations are not separate and distinct from the underlying claim, but are inextricably enmeshed with them." *Id.*

Under Rule 4, the petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.* A petitioner "who is able to state facts

showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions." And "[t]he judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

Rosling's petition is likely untimely. *Mayle v. Felix*, 545 U.S. 644, 664 (2005). To determine its timeliness, however, would require additional proceedings that are unnecessary in light of the record of the case and the standards of review that apply to it.

The Montana Supreme Court reached the merits of each of the claims Rosling presents in this Court. Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where a state court has denied relief on the merits, a state prisoner may obtain federal habeas relief only if the state court's denial of his claims "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's denial was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

These standards impose very heavy burdens on habeas petitioners. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786-87 (2011).

Further, where the petitioner claims ineffective assistance of counsel, his task is "all the more difficult." *Richter*, 131 S. Ct. at 788. Claims of ineffective assistance of trial counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must allege facts sufficient to support an inference that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "The standards created by *Strickland* and by § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)) (internal quotation marks and citations omitted). *See also Cullen v. Pinholster*, __

U.S. __, 131 S. Ct. 1388, 1398 (2010) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court").

Under these very high standards – and, in fact, even if the standards were significantly lower – Rosling's claims lack merit. Appointment of counsel in his case could be useful only on speculation that, in any habeas case, there might be claims that have not been fairly presented in the state courts. Speculation is not an appropriate basis on which to expend public funds. Because Rosling's claims lack merit, it is not appropriate to appoint counsel.

Consequently, the petition should be denied on the merits without requiring the State to file an Answer and without appointing counsel.

## IV. Analysis

### A. Trial Counsel

Rosling contends that trial counsel was ineffective in four respects. He also asserts cumulative prejudice from counsel's errors. Because, at this stage, Rosling must allege facts sufficient to support an inference of both deficient performance and prejudice, "there is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

#### 1. Palm Print

A latent palm print was found at the scene. It was not Jessica's, but no further attempt was made to identify its source before trial. After trial, comparison

showed the print was not Rosling's.[10] Rosling contends that counsel's failure to

obtain comparison of the palm print before trial was ineffective because it "created

doubt in the jury's mind as to whether he left the print at the murder scene." *Id.* at

5 (point heading). This claim is somewhat more complicated than it initially

appears.

The State did not question its fingerprint expert, Deborah Hewitt, about the

print. Defense counsel discussed the print in her opening statement and in closing

argument, and she brought it up with Hewitt. In opening statement, counsel said,

"There was a palm print: not Jessica's. Not Jared Rosling's." 2 Trial Tr. at 203:3-4.

In fact, that was not what the evidence showed. Hewitt testified the print was

"unidentified as of yet."[11] Defense counsel asked, "And that is because you were

never given the palm prints of anyone else to compare, correct?" Hewitt

responded, "That is correct." Counsel concluded, "So you can't say it's Jared

Rosling's palm print, can you?" Hewitt responded, "Cannot." 6 Trial Tr. at

1129:24-1131:5. In her closing argument, counsel said:

> [The State] would have you believe that [Rosling] went in there and
> he left no blood, because the only blood is Ryan Hill's, he left no
> fingerprints, not even that palm print. You remember hearing about
> that palm print that was either on the mirror or on the glass door of the
> shower, that palm print that's not Jessica Dooley's? Remember that?

---

[10] The record before this Court does not indicate why the palm print was tested after trial.
*See* Postconviction Hr'g Tr. (Doc. 11-15) at 8:18-24.

[11] Hewitt did not recall whether the print was located on the bathroom mirror or shower
stall or on the sliding glass door at the back of the house. It appears that no trial witness testified
to the location of the palm print.

> We don't know who it is because they never sent in palm prints from
> anybody else to test. So you've got no fingerprints.

9 Trial Tr. at 1612:25-1613:8.

At the postconviction hearing, counsel testified that she did not ask the State to compare the print to Rosling's because she did not know whether it would be his; and, if it was, it would refute his claim that he had never gone into Jessica's bathroom. Counsel instead asked the State to do mitochondrial DNA testing of the hair found on the plastic bag placed over Jessica's head; the hair, viewed under a microscope, resembled Rosling's.[12] Postconviction Hr'g Tr. (Doc. 11-15) at 31:12-22. She explained that both the palm print and the hair, if not connected to Rosling, would support a reasonable-doubt argument based on the lack of forensic evidence that Rosling was present in the bathroom. But, if either the palm print or the hair could be connected to Rosling, mitochondrial DNA evidence would be less compelling than identification of his palm print in the bathroom. *Id.* at 42:24-43:12. And, as counsel argued in closing, "if I drop a hair in this courtroom right now . . . it could show up anywhere, because it might attach to your pant leg or

---

[12] Given this resemblance between Rosling's hair and the hair found in Jessica's bathroom, *see* 6 Trial Tr. at 1147:11-1157:6, 1170:9-1174:23, counsel's decision to request mitochondrial DNA analysis was reasonable. Where microscopy shows resemblance between two hairs, mitochondrial DNA analysis may reinforce a connection, but it may also refute any connection. *See, e.g.*, News from the National Academies (Feb. 18, 2009), *available at* http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=12589 (accessed Oct. 25, 2013) (describing Committee on Identifying the Needs of the Forensic Sciences Community, *et al.*, *Strengthening Forensic Science in the United States: A Path Forward* (National Academies Press 2009).

your shoe and be carried out." 9 Trial Tr. at 1607:10-14 (parenthetical notations omitted). Thus, mitochondrial DNA analysis might have refuted the microscopic resemblance, but even if it did not, identifying the hair as Rosling's would not necessarily place him in the bathroom. Consequently, balancing potential support for a reasonable-doubt argument against potential prejudice, counsel made a calculated decision to do mitochondrial DNA testing on the hair. Pressing for further testing of the palm print – not knowing what the test might show – could have been disastrous to the defense.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Counsel's decision to limit her investigation of the palm print was reasonable. Although Rosling insisted he did not go inside the bathroom, he also told her he did not remember a lot of things that happened, Postconviction Hr'g Tr. (Doc. 11-15) at 42:14-23, and, after all, seeing Jessica in the bathroom was "an extremely stressful

emotional thing," *id.* at 9:12-22.[13] At the time counsel had to make the decision, she could not have known whether the palm print would be Rosling's or not. Moreover, the fact that it was not Rosling's palm print is not "exculpatory," as he claims. It does not prove he was not in the bathroom; it proves only that he did not leave the palm print. And, if the print had proved to be his, counsel could hardly argue that Rosling's palm print drifted in to the bathroom. As to this portion of Rosling's claim, the first prong of the *Strickland* test is not met.

But, rather than emphasizing the State's failure to connect the print to Rosling, counsel's unsupported opening statement and phrasing of her questions to Hewitt actually drew the jury's attention to the lack of a comparison palm print. And a reasonable juror could think that if Rosling really thought it was not his, he could have offered his own palm print for comparison.[14] While Rosling does not predicate his claim on counsel's opening statement or question to Hewitt, he does assert that failure to get the print tested – and, consequently, failure to show the jury it was not his – perversely created the impression that the print *could* have been his. Given the particular questions counsel asked of Hewitt, as well as counsel's mistaken statement in opening that the print was not Rosling's, her

---

[13]  In fact, Rosling himself testified at trial, "To be honest with you, I cannot say where I was. It was a moment that I would not recall exactly where I was. What I recall is what I seen." 8 Trial Tr. at 1422:8-10.

[14]  This is not to say the law required him to do so or that the State could have built an argument on his failure to do so. It is simply a thought a reasonable juror could have.

inability to prove up her opening statement may have become prejudicial to Rosling.

In the context of the rest of the case, however, any prejudice was dispelled. The jury was instructed on the presumption of innocence, the burden of proof, and reasonable doubt. *E.g.*, 2 Trial Tr. at 161:20-162:14, 165:14-166:12; Jury Instr. No. 4 (Doc. 19-1 at 7-8). Jurors are presumed to follow their instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Defense counsel established that Rosling consented to searches and photographs and cooperated in giving a buccal swab. *E.g.*, 7 Trial Tr. at 613:21-614:18. Her closing argument, *see supra* at 21, re-focused the matter on the State's failure to find any evidence placing Rosling in the bathroom.

Above all, the presumption of innocence was decimated by Rosling's own mutating accounts of his whereabouts and his stories' failure to match up with other evidence. He admitted he lied multiple times to multiple people – police as well as friends and family. Some of his lies had no evident motivation. He falsely told his family that he went to Jessica's house to "surprise" her, but, apparently forgetting this version of what happened, he told the jury she had invited him over. Some of his lies seemed designed to plant corroborating statements, such as his claim to Ryan Hill that Hazlitt locked him out, forcing him to go shopping for ski clothes on Sunday morning, or to plant an alibi, such as his claim to Brenneman

that he slept in his car outside Wood's house. Some of his lies concerned seemingly inconsequential matters, such as his claim to have smoked marijuana on the night of the murder even though there was no THC in his urine. The fact that Rosling left footprints when he came out the front door but not when he approached the front door was unexplained.

Although a "reasonable probability" is less than a preponderance of the evidence, *Strickland*, 466 U.S. at 693-94, Rosling cannot meet even that standard. It is not realistic to suppose the jury might have acquitted Rosling if only counsel had not made the mistaken statement in opening and instead highlighted the State's failure to connect the print to Rosling. Nor is there a reasonable probability that Rosling would have been acquitted if only counsel had proved that, in addition to all 11 identifiable prints *not* being Rosling's, the palm print also was *not* Rosling's. The second prong of the *Strickland* test is not met. This claim should be denied.

### 2. Prosecutor's Mischaracterization of Rosling's Testimony

Rosling contends that counsel should have objected to the prosecutor's misrepresentation of Rosling's testimony. Am. Pet. (Doc. 15) at 4 ¶ 15B; Br. (Doc. 15-3) at 8. The prosecutor said:

> [A]t 11:14, he goes into Shopko, where he buys deodorant and he buys men's Dri-Max ski gloves for $5.99, brand new ski gloves. What's he been doing during that two-hour time frame? Whatever he's been doing, it has gotten blood onto the palm of his hands which is so diffuse that you can't get DNA off it anymore, but as he told you, he may have been red-handed. Because he puts his hand into the

right hand of that glove, and as it's grabbed at the Crime Lab the next day, it's got blood in it on the palm of that right hand.

9 Trial Tr. at 1589:13-23.

In Rosling's cross-examination, the following exchange occurred:

Prosecutor:    Well, Stacy Brown found some blood on the palm area of those brand new ski gloves. Did you have a red hand?

Rosling:    I believe it was from –

Prosecutor:    So you were red-handed with blood when you stuck your hand into that brand new ski glove.

Rosling:    No, I did not have a red hand.

Prosecutor:    So do you know where the blood came from that was in that ski glove?

Rosling:    That blood from that ski glove could have come from a number of ways. When I was snowboarding, I know I did possibly get hurt a few times, just the way I ski and the way I snowboard. I do it all pretty aggressive.

Prosecutor:    Well, we had a stipulation of fact during our case that you had no recent injuries to your person other than the knuckles we've had pictures of.

Rosling:    That's true. It could be from my knuckles.

Prosecutor:    So did you somehow get the blood from your knuckles onto the palm of your hand to put in those brand new ski gloves hours later?

Hood:    I would object; that's not what the evidence states. Stacey Brown did not say it had to be on the palm of his hand.

The Court:    Overruled.

28

Go ahead.

Rosling:　　　No.

8 Trial Tr. at 1441:23-1442:25.

Although Rosling adamantly denied being "red-handed," he admitted he could have had blood on his hands from skiing or on his knuckles from playing "quarters" the night before. The prosecutor's claim in closing was not a technically precise recapitulation of Rosling's testimony, but it was not required to be. It was closing argument. Montana jurors know that hands are often pushed into gloves backwards, so that blood from a knuckle could easily be left in the palm of a glove. No reasonable juror would have accepted the prosecutor's closing argument as proof that Rosling actually confessed on the stand. In addition, the jury was instructed that the lawyers' statements were not evidence and the jurors should rely on their own recollection of the testimony. 9 Trial Tr. at 1562:17-1563:5. The prosecutor's statement in closing argument did not demand an objection from defense counsel. Neither prong of the *Strickland* test is met. This claim should be denied.

### 3. Prosecutor's Commentary on Witness Credibility

In closing, the prosecutor argued that Diehl had no motive to lie. 9 Trial Tr. at 1618:5-1619:2, *quoted in part in* Br. (Doc. 15-3) at 10. Although Rosling contends the argument was an inappropriate comment on Rosling's and Diehl's

credibility, Am. Pet. (Doc. 15) at 4 ¶ 15B; Br. (Doc. 15-3) at 9-10, it was fair argument.

A prosecutor improperly vouches for a witness's credibility when he "place[s] the prestige of the government behind the witness" or "indicate[s] that information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980). *See, e.g.*, *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (improper for prosecutor to say that, if the prosecution witnesses are not believed, "what you need to believe, ladies and gentlemen, [is] in this little case that the reputation of the department of justice would be put on the line to solicit false testimony just to prove up a case against these two defendants."); *United States v. Kerr*, 981 F.2d 1050, 1052-53 (9th Cir. 1992) (improper for prosecutor to ask "Were [the prosecution witnesses] hoodwinking [DEA Agent] Zarndt when I sat there on part of the interviews, were they hoodwinking me, were they hoodwinking the Court, when the Court accepts their plea agreements when they agreed to cooperate?"); *United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991) (improper for prosecutor to refer to evidence not in the record where three surveillance agents testified before jury but prosecutor said in closing that defendant "can't call 10 or 12 agents, surveilling agents, liars. It just doesn't work. You can maybe call one or two liars, but you can't call 10 or 12. . . So being an intelligent man, defendant created a story.").

These objectionable comments are qualitatively different from the prosecutor's arguments in Rosling's case. There was no improper vouching. Neither prong of the *Strickland* test is met. This claim should be denied.

### 4. Prosecutor's Mischaracterization of Hair Evidence

Rosling contends that counsel should have objected to the prosecutor's statement in closing argument that Rosling's hair "matched" the single hair found on (not inside) the plastic bag over Jessica's head. Am. Pet. (Doc. 15) at 4 ¶ 15B; Br. (Doc. 15-3) at 11-12.

The prosecutor did not mention the hair in the first portion of his closing argument. Defense counsel said:

> Then they have the hair. You heard all sorts of things about the hair that was found on the plastic bag. But the bottom line to the hair is that, as Alice Ammen told you, they can only say the hair is similar. And you saw those pictures, and I'm sure you saw, as I did, the dissimilarities also. And they ran DNA on this hair, mitochondrial DNA, and what did it show? That it was not a match. It can't be excluded, but it is not a match. And one of the final statements in that deposition from the gentleman who ran that test was, he could not conceive of any way he could say it's Jared Rosling's hair.
>
> And the other problem with trace evidence is that we never can truly know how evidence gets on anything, because as you will remember from the testimony, if I drop a hair in this courtroom right now, while I'm talking to you, it could show up anywhere, because it might attach to your pant leg (indicating) or to your shoe (indicating) and be carried out. So the usefulness of hair and trace evidence is certainly decreased by the fact that somebody may have been in a location earlier. But there's no proof that that's his or – that that's Jared Rosling's or that that got on there during the homicide. We just don't have that. And you can't simply suppose it.

9 Trial Tr. at 1606:22-1607:19.

In rebuttal, the prosecutor said:

He was clean-shaven . . . with a goatee on the front; a goatee with red hair, a goatee that's about a quarter-inch in length, a goatee that you have seen microscopically on the right side of the screen, almost exactly like the hair that was found on that bag that was tied around her lifeless body, a hair that had the same mitochondrial DNA as Mr. Rosling's. And true, the science is so cutting edge that all we have in the database is 4,510 people. And of 4,510 people nobody has a DNA that matches that particular DNA. True, some of those 4,510 people are of Pakistani descent. That should tell you, using your common sense, that they don't have red hair. And you recall the testimony of Alice Ammen that the FBI tells her that there's an 88 percent correlation between microscopic comparison which she did and mitochondrial DNA which was done in California. Sure, it's one piece of evidence. But it's part of everything else here.

*Id.* at 1619:6-24.

The hair found at the scene did not, in fact, have "the same mitochondrial DNA as Mr. Rosling's." It varied at one genetic location, 16193.1. While the expert forensic analyst said 2% to 8% of the human population exhibits heteroplasmy, he was not asked to quantify the likelihood that Rosling's mitochondrial DNA varied from the found hair at the specified location on the gene but was otherwise identical. Was heteroplasmy more or less common at that particular location? *See* 6 Trial Tr. at 1189:22-1190:23 (discussing heteroplasmy at a different genetic position). More importantly, the State made no comprehensible connection between the database and the frequency with which Rosling's or the

found hair's mitochondrial DNA sequence would occur in a population, much less the probability that the hair found in the bathroom was Rosling's. It presented no evidence whatsoever of the number of possible mitochondrial DNA sequences or that the FBI's database was a reasonable sampling of these sequences.

The State encouraged the jury to conclude that there was something "rare" about Rosling's hair and the unknown hair because "cutting-edge science" said the sequence of the unknown hair was not already included in the "population" of 4,510. The expert was not asked to explain why a mitochondrial DNA sequence can be a reliable tool for identification or a reliable means of assessing the probability that Rosling was the source of the hair or why or how the database had any bearing on anything.[15] That is not to say mitochondrial DNA is unreliable. The State simply did not lay appropriate foundation to support the conclusions it suggested in closing argument. What the State presented was not *persuasive*

---

[15] Rosling's sequence had a C in location 16193.1, where the sequence of the unknown hair had a T. *See* 6 Trial Tr. at 1194:13-25. Assuming Rosling falls within the 2%-8% minority of the population who exhibit heteroplasmy, then he might have been the source of the unknown hair. But, if Rosling's mitochondrial DNA always has a C and never has a T at location 16193.1, then – like 92% to 98% of the population – he does not exhibit heteroplasmy (at least not at that position) and he was definitely not the source of the unknown hair. What are the chances that someone who does *not* exhibit heteroplasmy would have a C rather than a T at location 16193.1? The expert did not say. How many of Rosling's hairs would he have to give up before we could safely conclude he does not exhibit heteroplasmy? How many genetic positions did the analysis compare – a hundred thousand? A thousand? Dozens? The expert did not say. How was the database compiled? Was Rosling's sequence, or that of the unknown hair, entered into it? What if the next five sequences entered in the database turned out to be identical to Rosling's and taken from five different people, all of whom were unrelated to Rosling and none of whom exhibited heteroplasmy? Wouldn't that significantly change the expert's testimony, or at least the State's inferences from it?

scientific evidence. It was merely big words delivered with a seal of approval by science and by the State.

But counsel's decision not to object to the State's closing argument was not unreasonable. She had already pointed out that Fedor said he could not possibly say the unknown hair was Rosling's. She pointed out that if 2% to 8% of the population exhibits heteroplasmy, then 92% to 98% of the population is not. Further, she pointed out that, even if the hair was Rosling's, there was no evidence to show when or how it wound up where it was found. As she said, the hair could have been unknowingly picked up and deposited there by someone else. Several witnesses testified that Jessica did not clean her house frequently, *e.g.*, 2 Trial Tr. at 220:10-11, 3 Trial Tr. at 381:20-382:1, and everyone agreed that Rosling was in Jessica's house the previous week. More importantly, Rosling testified he was in the house and saw Jessica dead before her father found her.

Had the hair been clutched in Jessica's hand, or had Rosling claimed he had never been to Jessica's house, the mitochondrial DNA evidence would have played a different role. But here, the presence of the hair was not inconsistent with Rosling's testimony. And while the location of the hair was arguably dramatic, it did not prejudicially undermine Rosling's credibility.

Counsel performed reasonably. There is no reasonable probability that Rosling would not have been convicted if only counsel had objected to the State's

rebuttal closing about the hair. Neither prong of the *Strickland* test is met. The Montana Supreme Court's ruling on this claim is further buttressed by the high standards of § 2254(d). This claim should be denied.[16]

### 5. Cumulative Prejudice

Rosling asserts the prejudicial effects of all instances of defense counsel's failure to object to prosecutorial misconduct must be accumulated and considered together. *See* Br. at 13. But counsel's performance was not deficient with respect to any of these claims. Because a claim of ineffective assistance fails if there is no showing of deficient performance, there is no reason to consider cumulative prejudice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006); *Strickland*, 466 U.S. at 697.

Even if some aspect of counsel's performance had been deficient with respect to the forensic evidence, however, Rosling's own words and behavior were the crucial evidence against him. His car was identical to the one Rosaline Diehl saw. He said he parked where she saw his car. He was in the house at a time consistent with the time of the murder. He told lies, to police, to family, and to

---

[16] Rosling did not present in the state courts a claim against the prosecution's presentation of this testimony or an ineffective assistance claim based on counsel's failure to move to exclude or strike it (assuming, for argument's sake, she did not so move). Even if Rosling had presented such a claim, however, the *Strickland* prejudice standard is not met, nor did the State's sloppy and misleading presentation of the expert's testimony have a substantial and injurious effect on the jury's verdict in light of the entire trial transcript. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). In another case, the outcome, either on the merits or on the issue of appointment of counsel, might be different. *Cf. Trevino v. Thaler*, __ U.S. __, 133 S. Ct. 1911, 1921 (2013); *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309, 1320 (2012).

friends, for no apparent reason. In his cramped and cold car, he took off a pair of jeans that, according to everything he said, should have been clean and dry, and he instead put on a pair of long johns with a hole in them to go into Walmart so he could buy another pair of pants, then discarded the long johns as he left the store. If Rosling's testimony was to be believed, he sometimes left footprints where he walked in the snow and sometimes did not.

Rosling did not explain why he changed out of his jeans, but he did not need to. The blood and water in Jessica's bathroom and the blood on his shoes explained that decision. Rosling did not explain why he sometimes left footprints in the snow and sometimes did not, but he did not need to. Like everyone else, where he did not walk, he did not leave footprints. Rosling did not explain why he lied to his friends as well as Detective Fischer, but he did not need to. He lied because he could not afford to tell the truth about where he was and what he did.

There is no reasonable probability Rosling would have been acquitted but for the mitochondrial DNA evidence and the untested palm print. This claim should be denied.

## B. Appellate Counsel

Claims of ineffective assistance of appellate counsel are governed by the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

### 1. Motion for Mistrial

The prosecution blundered its Power Point presentation and briefly displayed at least one inadmissible photograph of Rosling, allegedly showing a lightning-"SS" tattoo with a swastika, to the jury. *See* Verified Pet. (Doc. 15-1) at 4. The trial judge said, however, "it was inadvertent, it was quick, and they were of a small nature," that is, "thumbnails." 4 Trial Tr. at 641:10-642:11. The record on appeal contained no information as to the size of the screen on which the thumbnails were displayed, the size of the thumbnails on the screen, or the proximity of any juror to the screen, and no information as to the actual nature of the prejudicial image or images. *See* 4 Trial Tr. at 639:14-642:6.

An attorney may "fail to raise an issue because she foresees little or no likelihood of success on that issue." *Miller v. Keeney*, 882 F.3d 1428, 1434-35 (9th Cir. 1989). Provided that assessment is reasonable, neither prong of the *Strickland* test is met. *Id.* Here, appellate counsel reasonably decided the issue was not appropriate for appeal, because the description of the photographs in the trial transcript was not illuminating. Postconviction Hr'g Tr. (Doc. 11-15) at 48:7-18, 49:8-50:20. There is no reasonable probability the Montana Supreme Court would have ordered a new trial, because the facts in the record did not support the claim. Neither prong of the *Strickland/Robbins* test is met. This claim should be denied.

## 2. Rosling's Absence from In-Chambers Conference

Counsel did not challenge Rosling's absence from an in-chambers conference on the issue of Officer Davis's proposed testimony. The record does not indicate who attended. 8 Trial Tr. at 1530:20-1535:10.[17] There was no factual support, therefore, for a claim that, contrary to standard practice in Montana's state courts, Rosling was not present in person at a conference held outside the presence of the jury.

Further, the purpose of Davis's testimony was to show that Diehl was "very wide awake and very alert," 8 Trial Tr. at 1537:23-24, when she made her initial statement to police, in which she said she went back to bed after seeing a car park on the dead end around 6:00 a.m. If Diehl went back to bed, then the first car that pulled up could have been someone else's. Rosling might have just happened to park in the same place later, while Diehl was in bed, only to have her memorize all the details of his car's appearance after she awoke the second time.

Thus, contrary to Rosling's claim, Br. (Doc. 15-3) at 23, Davis's testimony favored the defense, because it tended to undermine Diehl's insistence that she watched the car the whole time it was there, from the moment it parked until the

---

[17] Even at the postconviction hearing, where Rosling could have developed the evidence, counsel testified that she would not have attended the conference without her client. Postconviction Hr'g Tr. (Doc. 11-15) at 25:20-26:15. The State pointed out that it and the trial judge knew the same rule requiring Rosling's presence. *Id.* at 36:1-37:2. Rosling said he had never been in the judge's chambers, but he also said that at least some conferences indicated as having taken place in chambers actually occurred in the courtroom. *Id.* at 73:22-74:4. Rosling did *not* testify that he was not present for the conference on Davis's testimony.

driver returned, got in, and drove away. Diehl explained her initial statement by saying she "was under stress" and "changed my mind," 2 Trial Tr. at 285:21-286:2, and the "whole morning was very confusing," *id.* at 292:23. Davis said she did not seem confused. 8 Trial Tr. at 1538:11-17.

Appellate counsel cannot argue an issue without factual support in the record, and there was no indication that Rosling was *not* present at the conference. Nor is there any reasonable probability Rosling's case would have been remanded for a new trial, because Davis's testimony "was critical to his case," and Davis testified. *State v. Charlie*, 239 P.3d 934, 945 ¶ 46 (Mont. 2010). Neither prong of the *Strickland/Robbins* test is met. This claim should be denied.

### C. Sufficiency of the Evidence

A state habeas petitioner is entitled to federal habeas relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) (federal Constitution requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . charged."). All of the evidence must be considered in the light most favorable to the jury's verdict. *Jackson*, 443 U.S. at 319. Because it remains "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts," *id.*, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution," *id.* at 326.

Whether the evidence is sufficient to support a particular element beyond a reasonable doubt "must be gauged in the light of applicable [State] law defining the element." *Jackson*, 443 U.S. at 324. A reasonable doubt is "based on reason which arises from the evidence or lack of evidence." *Id.* at 317 n.9 (quoting *Johnson v. Louisiana*, 406 U.S. 356, 360 (1972)).

And, again, the high standards of 28 U.S.C. § 2254(d) apply.

### 1. Deliberate Homicide

"A person commits the offense of deliberate homicide if the person purposely or knowingly causes the death of another human being." Mont. Code Ann. § 45-5-102(1)(a) (2003); *see also* Jury Instr. (Doc. 19-1) Nos. 7-8. "A person acts purposely when it is his conscious object to cause such a result." Jury Instr. No. 21. "A person acts knowingly when the person is aware there exists a high probability that the person's conduct will cause a specific result." Jury Instr. No. 22. *See also* Mont. Code Ann. § 45-2-101(34), (64) (2003).

A rational juror could have found that Rosling was the person who killed Jessica Dooley. His car was nearby at the pertinent time, a man matching his

description went to and from the car at times consistent with the time of the murder. Rosling's own accounts of his activities at the time were consistent with someone trying very hard to conceal his involvement in the crime. A trace of Jessica's blood was found on his jacket. Each of these things could have been explained by other means. But a reasonable juror, putting them all together, could find Rosling guilty, beyond reasonable doubt, of deliberate homicide. This claim should be denied.

## 2. Aggravated Kidnapping

> A person commits the offense of aggravated kidnapping if the person knowingly or purposely and without lawful authority restrains another person by either secreting or holding the other person in a place of isolation or by using or threatening to use physical force . . . to inflict bodily injury on or to terrorize the victim or another.

Mont. Code Ann. § 45-5-303(1)(c) (2003); *see also* Jury Instr. Nos. 12-13.

A rational juror could have found the following facts beyond a reasonable doubt. Rosling strangled Jessica in the bedroom but stopped, allowing her to recuperate to the point that she attempted to clean herself up. But he did not let her leave. Her cell phone was found on a chair in her bedroom, but Rosling did not let her call for help. He made her stay where she was and where he was. He had no lawful authority to stop her from leaving or calling for help. He did so because he intended to inflict further injury and terror upon her; having strangled her to the point of defecation, after all, he could hardly allow her to go about her life as usual.

A reasonable juror could have found that Rosling kept Jessica in a place of isolation – the bedroom and bathroom of her own home, away from any means of obtaining respite or rescue. In sum, a rational juror could have found each element of aggravated kidnapping beyond a reasonable doubt. This claim should be denied.

### 3. Aggravated Burglary

> A person commits the offense of aggravated burglary if he knowingly enters or remains unlawfully in an occupied structure with the purpose to commit an offense therein and . . . in effecting entry or in the course of committing the offense or in immediate flight thereafter, he purposely, knowingly, or negligently inflicts or attempts to inflict bodily injury upon anyone.

Mont. Code Ann. § 45-6-204(2)(b) (2003); *see also* Jury Instr. Nos. 14-15.

A rational juror could have found, beyond a reasonable doubt, that Rosling lied when he said Jessica invited him over but did not lie when he wrote to his family that he went to her house to "surprise" her. A reasonable juror could have found that Rosling was lying when he said he approached the front door, because there was no corroborating evidence to support his claim. A reasonable juror could have concluded, based on the footprints, that Rosling approached the house from the back and crept in through the sliding glass door, without Jessica's knowledge. Reasoning back from what Rosling did in the house, a reasonable juror could have found, beyond a reasonable doubt, that Rosling unlawfully entered the house with the intent to commit a felony. This claim should be denied.

### 4. Tampering with Evidence

A person commits the offense of tampering with or fabricating physical evidence if, believing that an official proceeding or investigation is pending or about to be instituted, he . . . alters, destroys, conceals, or removes any record, document, or thing with purpose to impair its verity or availability in such proceeding or investigation.

Mont. Code Ann. § 45-7-207(1)(a) (2003); *see also* Jury Instr. Nos. 17-18.

A rational juror could have found that the knife Rosling used to stab Jessica was found in a kitchen cupboard. The same juror could have concluded that Jessica did not put it there, did not use water and towels and clothes to wipe up her own blood, and did not find magazines, pile them around herself, and set them alight.

Thus, a reasonable juror could have found, beyond a reasonable doubt, that Rosling took steps to obscure the evidence. This claim should be denied.

### 5. Possession of Dangerous Drugs

Rosling admitted ingesting a substance he knew to be methamphetamine. *See In re R.L.H.*, 116 P.3d 791, 795-96 ¶¶ 23-26 (Mont. 2005); Mont. Code Ann. §§ 45-2-101(58), 45-9-102(1) (2003). This claim should be denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

In light of the length of Rosling's sentence, the Court has carefully considered whether there might be any substance to any of Rosling's claims and, in particular, whether counsel should be appointed to represent him. But all of his claims challenge either counsel's performance or the sufficiency of the evidence, and all were decided on the merits by the Montana Supreme Court. 28 U.S.C. § 2254(d) sets the bar very high. Further, although no one item of evidence presented at trial was conclusive alone, taken all together, the evidence was truly overwhelming, due in very large part to Rosling's own statements and trial testimony. The trial transcript does not suggest a reasonable juror could have retained reasonable doubt on any count.

Counsel's pre-trial decision not to compare the palm print in the bathroom with Rosling's was reasonable, because she could not have known whether it would be Rosling's or not. Nor was Rosling prejudiced, even though it was not his print. No print was shown at trial to be Rosling's, and there was no reason to think the palm print had to have been left by the killer. Any latent prejudice from

counsel's reference to the print in her opening statement or from her manner of questioning the expert witness was dispelled by her closing argument and by the trial court's instructions to the jury on the burden of proof.

The prosecutor's closing argument did not mischaracterize Rosling's testimony, so counsel was not required to object and Rosling also cannot show prejudice. The prosecutor's closing argument about witness Diehl's credibility was appropriate; again, counsel was not required to object and Rosling cannot show prejudice. Although the prosecutor did indeed mischaracterize the mitochondrial DNA evidence, the fact that Rosling testified he was there and saw Jessica's dead body undermined the significance of the hair's presence and location. Further, the presence and location of the hair did not corroborate or reinforce any other evidence; it merely established that Rosling's hair was at the scene. The prosecutor's mishandling of the mitochondrial DNA evidence did not substantially contribute to the verdict because all the other evidence was overwhelming. Counsel's performance was reasonable, so there is no prejudice to accumulate; and even considering the palm print and the mitochondrial DNA together, there is no reasonable probability a reasonable juror would have retained reasonable doubt.

Appellate counsel did not have a sufficient record on direct review to support either of the arguments Rosling claims he should have presented. He could

not have shown that Rosling was prejudiced by the denial of his motion for mistrial or that Rosling was absent from an in-chambers conference.

Finally, the State presented sufficient evidence of each element of each crime to support the jury's verdicts beyond a reasonable doubt.

Rosling presents no open questions and nothing on which reasonable jurists could disagree. The law underlying denial of his claims is well-established. A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The claims set forth in the motion to reconsider and the Amended Petition (Docs. 6, 15) should be DENIED on the merits;

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Rosling may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If Rosling files objections, he must itemize each factual finding to which objection is made and

must identify the evidence in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Rosling from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Rosling must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of this case without notice to him.

DATED this 26th day of November, 2013.

 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge